## Spradlin, Administratrix v. Wright Motor Car Company.

(Decided January 22, 1918).

### Appeal from Boyd Circuit Court.

1. Principal and Agent—Automobiles—Negligence.—Whether a person who hires from an employe of a motor car company an automobile standing on the street in front of its garage, without making inquiry as to whether the motor company is the owner of the machine, has the right to look to it for indemnity in the event anything happens, due to the negligence of the driver or the defective condition of the car, is a question raised but not decided.

2. Principal and Agent—Automobiles—Negligence.—Where a machine standing on the street in front of a garage, was hired by an employe of the garage to a stranger who made no inquiry concerning who owned the machine or in whose employ the

chauffeur was, and the uncontradicted evidence shows that the machine company did not own the machine, or keep it for hire, or hire it, or have anything to do with the employment of the chauffeur, the machine company was not liable for the negligence of the chauffeur or for defects in the machine. Any person may keep his machine in a garage, and hire or authorize its hiring to anybody that he pleases; and when he does so and engages a chauffeur to run it, the owners of the garage will not be liable for what happens merely because the machine was kept in their garage, or because one of their employes, who was authorized to do so by the owner of the machine, engaged a chauffeur for him to run the car.

D. M. HOWERTON for appellant.

H. R. DYSARD for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

R. L. Spradlin, while riding in an automobile, was killed when the machine turned over, and in this suit by his widow as administratrix to recover damages for his death, it was charged that the accident in which he lost his life was caused by the negligence of the chauffeur of the Wright Motor Car Co., from whom it was alleged the automobile had been hired, and by the failure to have it equipped with sufficient lights.

After the pleadings had been made up, the case went to trial before a jury, and upon the conclusion of the evidence for the plaintiff, the trial judge directed a verdict for the Wright Motor Car Co. Its chief defense was that it did not own or hire the automobile in which Spradlin was riding when killed and that the chauffeur was not its employe, and we may confine the opinion to the issue presented by so much of the petition as charged "that the defendants, Giles and Charles Wright, are now, and were on the 26th day of August, 1914, partners, trading and doing business under the firm name and style of the Wright Motor Car Co., and were the owners of, and engaged in the operation of a garage in Ashland, and as owners and operators of such garage were the owners of certain automobiles, which they let for hire. . . . That on the 26th day of August, 1914, one Eugene Hager hired from the defendants for himself and the said Spradlin, deceased, an automobile for the purpose of driving from Ashland to certain points in the state of West Virginia. That pursuant to said contract of hire the defendants undertook to carry the said Hager

and Spradlin by automobile to the aforesaid designated points, and furnished for said transportation an automobile and driver for same''; and to so much of the answer as controverted the averments that the defendants let or hired to Hager for himself and Spradlin, or one or the other, an automobile, at the time in question and undertook to carry Hager and Spradlin to the points designated.

The only witnesses for the plaintiff on this issue were Hager, Montgomery, Childers and Messersmith.

Hager, at the time the automobile was hired, was so much under the influence of intoxicating liquor that he did not have a clear understanding of what occurred. But on his examination as a witness for the plaintiff he said that about eleven o'clock at night on August 26th he was in bed over the saloon of Sparks in Ashland, which it appears was next door to the garage of the Wright Motor Car Co., when Spradlin, who had been sent by his wife to bring him home, came into the room, and after some conversation, an automobile ride was proposed. He was asked and answered the following questions:

"Q. Who was the man you and Mr. Spradlin applied to for an automobile? A. I think it was Mr. Maynard, the same man that drove me the day previous. Q. Where was he? A. He was just in front of Wright's, just below Bill Sparks' saloon. Q. Where was the machine? A. It was standing there just between Bill Sparks' and the Wright Motor Car Company's place. Q. The machine was standing in front of the garage? A. Yes, sir. Q. Now are you positive about who it was you got the machine from? A. I am just that positive; might be mistaken; that is my remembrance of it. Q. Was there anybody else there at the Wright Motor Car Co. at that time in charge of the place? A. I was not in their place. Q. As I understand you, these transactions occurred on the outside? A. Yes, sir; they occurred on the sidewalk before we got the machine. Q. Was there anything said there about where you were to go to in the machine? A. Not a word. Q. Now after you got the machine, who got into it? A. Mr. Spradlin and Mr. Montgomery.''

And after telling as best he could where they went and what they did and how the accident happened in which Spradlin lost his life, he was asked: "Q. Had you employed a machine from the Wright Motor Car Co. at any time before that? A. Not except on this occasion I spoke about a while ago. Q. Was that machine you used

the day before the same machine that you used that night? A. I thought so and think so yet. Q. Do you know who the chauffeur was? A. I think his name was Koutz.''

Montgomery testified that on the evening of this day he met Spradlin at Catlettsburg and they went together to Ashland, where they found Hager in bed over Sparks' saloon; that a little while afterwards he left Hager and Spradlin standing in front of Wright's garage talking; that when he came back some suggestion was made about taking a ride and a machine was procured. He was asked: ''Q. Do you know from whom they got this machine? A. I do not. Q. I believe they got the machine while you were back in the saloon? A. Yes, sir. Q. Where was the car when you all got into it? A. Standing right in front of the garage. Q. Who was in it? A. Hager and Spradlin were already in it and then I got in the machine. Q. Then the machine had been employed while you were in the saloon? A. Yes, sir.''

Childers testified that on the day the accident happened he took a ride with Hager in an automobile from Ashland to Ironton, Ohio; that they got the machine at this time from the Wright Motor Car Co.; that he hired the machine and paid for it; that they returned from their trip about three o'clock in the afternoon.

Messersmith testified that on the night that Hager, Spradlin and Montgomery took the ride during which Spradlin was killed, he was employed by the Wright Motor Car Co. as a night watchman at their garage. Asked if he knew the car that Spradlin was in when killed, he answered, ''Yes, sir. Q. Do you know who let them have the car? A. I let the car out of the garage, yes, sir. Q. At what time of the evening was it? A. Between ten-thirty and eleven o'clock. Q. To whom did you let the car? A. Mr. Hager and Mr. Spradlin. Q. Where were you when you let them have it? A. I was out in front of the garage. Q. At that time I believe you said you were working for the Wright Motor Car Co.? A. Yes, sir. Q. Who asked you about the car? A. Why, Mr. Hager was the one that asked me about the car. Q. Who drove the car? A. Mr. Denny Koutz. Q. Where was he working at that time? A. At Marting's garage. Q. Who employed him to drive the car? A. Mr. Pemberton employed him to drive the car and I went over after him, Q. Where was Pemberton when Hager and Spradlin came to you after a machine? A. I could not tell you.

He was out driving some place. He wasn't there. Q.
Was there anybody else in the garage that night except
you? A. No, sir.''

He further said that he heard about the accident early
the next morning through one of the Wrights who in
some way that he did not know of got word about it; that
after the accident he saw the machine in which they had
been riding at the Wright Motor Car Co. He then pro-
ceeded to testify as follows: ''Q. Did you have any
authority to hire machines for the Wright Motor Car
Co.? A. No. Q. Whose machine was this that you
hired? A. Mr. Pemberton's. Q. How came you to hire
that machine? A. Mr. Pemberton left word with me
if anybody wanted a car and I could get a driver for it,
to let it go out. Q. And you went over to Marting's
garage to get a driver? A. Yes, sir. Q. Did they say
what they wanted the machine for when they came there?
A. They said they wanted a machine to ride around a.id
sober Hager up, and I told them not to get off of the
paved streets, that it was a bad night and that there were
no chains on the car. Q. What did they say? A. That
they didn't want to drive off of the paved streets; that
they just wanted to drive around town and sober Hager
up. Q. You got information the next morning that they
had gone over the banks in the hills of West Virginia
somewhere? A. Yes, sir. Q. Did you hire that ma-
chine to go to West Virginia? A. No, sir. Q. Did you
know that they were going to West Virginia? A. No,
sir. Q. If you had known it, would you have let the
machine go? A. No, sir; without any chains on it, I
would not. Q. You instructed the chauffeur not take the
machine off the paved streets? A. Yes, sir; just to run
it around town. Q. When was that machine sold to Pem-
berton? A. Some time in July. Q. After it was sold
to Pemberton, did the Wright Motor Car Co. have any-
thing to do with it at the time of the accident? A. Not
as I know of. Q. Who controlled the machine? A. Mr.
Pemberton. Q. Was there anything done to the machine
of Pemberton in the garage except to store it for him?
A. No, sir. Q. I believe you say that you went and got
a chauffeur? A. Yes, sir. Q. Who did you employ the
chauffeur for? A. Mr. Pemberton. Q. Did you have
any authority to employ a chauffeur for the Wright Mo-
tor Car Co.? A. No, sir; unless I had instructions. Q.
Did you have any instructions at this time? A. Not from

the Wright Motor Car Co.  Q.  How do you know this was Pemberton's car?  A.  I heard him and Mr. Wright talking about it and heard him tell Mr. Wright he wanted the car to run in taxi service.  Q.  How do you know it was Pemberton's car?  A.  Only from the instructions I got from him.  Q.  Did you get any orders from him on this evening about letting it go out?  A.  Yes, sir; he told me if anybody came after the car to let them have it if I could get a driver.  And when these parties came after the car, I got Koutz to drive for them.  Q.  The Wright Motor Car Co. let cars for hire sometimes, didn't they?  A.  Yes, sir.  Q.  Do you know whether this car was repaired after the accident?  A.  Yes, sir; repaired by the Wright Motor Car Co.  That was their business to repair machines."

This being all the evidence, the trial court properly, as we think, took the case from the jury, as there was no evidence that the Wright Motor Car Co. owned the machine in which the parties were riding or employed or controlled the chauffeur who was driving it or hired the machine to be run in West Virginia.

It is said, however, by counsel for the appellant that as the machine these people hired was standing in front of the garage of the Wright Motor Car Co., and the man from whom it was hired was an employe of this company, the hirers had the right to assume, in the absence of information to the contrary, that the machine was owned by the motor car company in front of whose place of business it was standing, and the right to look to it for indemnity for anything that happened due to the negligence of the driver or the defective condition of the car, and so the case was one for the jury.

We do not. however, find it necessary under the facts of this case to express an opinion as to the soundness of the principle suggested, because in no event should it be allowed to have controlling authority on this case to the extent contended for.

The evidence shows without dispute that Messersmith had no authority to hire out machines owned by the garage company, and that he did not do so; that he was merely a night watchman and hired to Hager a machine owned by one Pemberton, and employed for Pemberton a chauffeur to run it; that the machine was hired only to go about in the city of Ashland and would not have been hired in the condition it was in to go off the

streets of that city, but that it was taken by the hirers out of the city and into West Virginia where the accident occurred; that no inquiry was made or information volunteered as to who owned the machine or whose servant the chauffeur was; that when engaged the machine was in the street in front of the garage, and the man who let it out was only a night watchman for the garage company.

Now we think it quite clear that any person may keep his machine in a garage and hire or authorize its hiring to anybody he pleases, and when he does so and engages a chauffeur to run it, the owners of the garage are not to be held liable for what may happen on account of the negligence of the chauffeur or the defective condition of the car merely because the machine was kept in their garage or because one of their employes, who had no authority to let out machines for them, but who was authorized so to do by the owner of the machine hired, engaged for him a chauffeur to run the car.

In and about every garage of any size there are many cars not owned or controlled by the garage people, and to hold them liable for everything that an unauthorized employe of theirs might do as the servant of some one else, would unreasonably extend the limits generally applied in holding principals responsible for the acts of their agents or masters responsible for the acts of their servants.

In addition to this, we are of the opinion that in no event could the Wright Motor Car Co. be held responsible for this accident which occurred at a place and under circumstances entirely outside of the limits of the territory in which the machine was engaged to run. When the hirers of this machine took it out of the city of Ashland and into the State of West Virginia, the car was not engaged in the service for which it had been hired, nor was the chauffeur employed in the service for which he had been engaged. At the time of the accident he was acting as the servant of the occupants of the car and not as the servant of Pemberton.

Wherefore, the judgment is affirmed.